Cecil Blaffer FURSTENBERG and Richard M. Sheridan

v.

The UNITED STATES.

No. 306–74.

United States Court of Claims.

March 21, 1979.

Charles W. Hall, Houston, Tex., attorney of record, for plaintiffs; Gerald W. Haddock, Houston, Tex., of counsel.

Donald H. Olson, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for Art Dealers Association of America, Inc., amicus curiae; Ralph F. Colin and Gilbert S. Edelson, New York City, of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and SMITH, Judge.

## OPINION

PER CURIAM:

The issue before the court in this action for recovery of federal income taxes is the fair market value of a figure painting by Jean Baptiste Camille Corot, "La Meditation," during the 2-year period 1967–68, in which the plaintiffs donated undivided interests in the painting to the University of Houston. Both parties appeal from the decision of Senior Trial Judge Mastin G. White that the value of the painting was $160,000.

██ With one important exception discussed below, we agree with and adopt the trial judge's opinion and findings as the basis for our decision in this case.[1] We conclude, however, that the trial judge improperly rejected, or discounted to too great an extent, the testimony of one of the defendant's expert witnesses, Eugene V. Thaw, because of possible bias. Mr. Thaw's valuation of the painting was substantially lower than that of the defendant's other expert witness, Alexandre P. Rosenberg, upon whose valuation the trial judge primarily relied. Our independent review of the record, giving what we deem to be the appropriate weight to the testimony of Mr. Thaw, leads us to conclude that the value of the painting in 1968 and 1969 was $125,000.

Five expert witnesses testified concerning the valuation of "La Meditation." Although the trial judge stated that all of them had "impressive qualifications," he singled out the opinions of three of them as entitled to "special weight": Spencer A. Samuels, plaintiffs' expert, and Messrs. Thaw and Rosenberg, the defendant's experts. Mr. Samuels valued the painting at $250,000. The trial judge rejected or greatly discounted Samuels' valuation because he was "a good friend and long-time business associate" of the plaintiff Mrs. Furstenberg. The trial judge similarly disregarded or discounted the valuation of Mr. Thaw, which was $40,000, because this expert had "possible bias" resulting from his activities on the Art Advisory Panel. The Art Advisory Panel is an expert body which values paintings and other works of art for the Internal Revenue Service. Although Messrs. Thaw and Rosenberg both were closely associated with the panel, only Mr. Thaw served on the particular panel which valued "La Meditation." The trial judge stated that, because there was no basis for "attributing possible bias to Mr. Rosenberg," his valuation of the painting at $90,000 was "probably closer to the mark than Mr. Samuels' valuation of $250,000 or Mr. Thaw's valuation of $40,000."

The trial judge held, however, that "Mr. Rosenberg failed to give sufficient weight

---

1. Although we have adopted the trial judge's separate findings of fact, we have printed only findings 47–52, which deal with the expert testimony on valuation. The remainder of the findings have not been printed since, to the extent necessary to the decision, they are set forth in the opinion.

to the dramatic effect which the sale of 'Girl in Red With Mandolin' to Norton Simon for $310,000 in October 1967 had on the value of Corot's figure paintings." The sale to Mr. Simon occurred at a widely publicized art auction, and the trial judge found (finding 35(g)) that the sale "was generally regarded in the art world as a price 'breakthrough' for figure paintings by Corot." The trial judge concluded that "the fair market value of 'La Meditation' was slightly more than half that of 'Girl in Red With Mandolin,' or approximately $160,000, in December 1967 and in December 1968."

We think that the trial judge properly attributed bias to the expert witness Thaw because of the latter's membership on the particular panel that valued "La Meditation" for the Internal Revenue Service. The Art Advisory Panel is a voluntary group of distinguished art experts who, without compensation, perform the public service of advising the Internal Revenue Service concerning the value that taxpayers give to particular works of art. The panel valuation of "La Meditation" at $85,000 was more than twice Mr. Thaw's valuation at trial.

There is no reason to assume that, because an expert has expressed an opinion during confidential deliberations of a particular panel and has heard the views of the other experts, he will give anything other than his best independent expert judgment if called as a witness on the question of valuation. Although the expert may continue to adhere to the valuation he expressed during panel deliberations, this fairly cannot be deemed to reflect bias rather than the reaffirmation of his professional judgment. Mr. Thaw's testimony here confirms that conclusion, since the valuation he gave was less than half that of the panel. If Mr. Thaw's participation in the work of the panel created some pressure on, or psychological need for him to defend the panel's valuation, presumably he would have followed closely the conclusion of the group rather than depart from it as drastically as he did.

Furthermore, viewing an expert's participation on the Art Advisory Panel as creating personal bias might unnecessarily discourage distinguished experts from participation on the panel, to the ultimate detriment of the Internal Revenue Service and the tax system, or might reduce the availability of expert witnesses at trial. The record indicates that there is only a relatively small number of experts qualified to evaluate the works of certain artists, and these are the individuals inevitably called upon to assist the panel. Members of such a group of experts should not be disqualified unless it unequivocally appears that participation in the work of the Art Advisory Panel creates personal bias. There is nothing in this record to suggest that Mr. Thaw's participation had that effect.

We therefore conclude that, in valuing "La Meditation," the testimony of both Mr. Thaw and Mr. Rosenberg must be given substantial weight. For the reasons explained in the discussion that we have substituted in the trial judge's opinion for his own discussion of this point (which we identify in the opinion), we conclude that the fair market value of "La Meditation" in 1968 and 1969 was $125,000.

## OPINION OF THE TRIAL JUDGE

WHITE, *Senior Trial Judge*: The primary task before the court in this case, which is for the recovery of income taxes and interest paid for 1967 and 1968, can be stated quite simply as that of determining the fair market value, in December 1967 and in December 1968, of Jean Baptiste Camille Corot's figure painting entitled "La Meditation." The answer to this question, however, is far from simple. Unlike such things as fungible goods or corporate stocks that are traded daily in substantial quantities at markets that provide readily available price statistics as indications of value, Corot's figure paintings are rare, they are bought and sold infrequently, and (as this case vividly illustrates) knowledgeable persons have widely varying opinions as to the comparative artistic quality and fair market value of such paintings.

This case arose because the plaintiff Cecil Blaffer Furstenberg (who will usually be referred to hereafter in the opinion as "Mrs. Furstenberg"), the then owner of "La Meditation," contributed an undivided 7/24ths interest in the painting to The University of Houston on December 28, 1967, and she later contributed an additional 15/24ths interest in the painting to The University of Houston on December 13, 1968.[1]

In her income tax return for 1967, Mrs. Furstenberg, who was then a feme sole named Cecil Blaffer Hudson, reported and claimed a charitable deduction of $72,917 for her 1967 contribution of the undivided 7/24ths interest in "La Meditation" to The University of Houston. Then, for the year 1968, Mrs. Furstenberg and the plaintiff Richard M. Sheridan, who was Mrs. Furstenberg's husband at the time,[2] filed a joint income tax return in which they reported and claimed a charitable deduction of $156,250 for Mrs. Furstenberg's 1968 contribution of the undivided 15/24ths interest in the painting to The University of Houston. Thus, for income tax purposes, the painting was valued at $250,000 by Mrs. Furstenberg as of December 1967 and by both plaintiffs as of December 1968.

Upon subsequent audit of the 1967 and 1968 income tax returns previously mentioned, the Internal Revenue Service ("IRS") determined that the deductions claimed for charitable contributions had been overstated because (according to the IRS) the fair market value of "La Meditation" was $85,000—and not $250,000—as of the respective dates when Mrs. Furstenberg contributed the undivided interests in the painting to The University of Houston. The IRS accordingly assessed tax deficiencies and interest totaling $33,687.37 for 1967 and $96,148.58 for 1968. These amounts were duly paid to the IRS, and subsequent claims for refund were denied by the IRS.

*Valuation*

Jean Baptiste Camille Corot was an outstanding 19th century French painter. He is a particularly important figure in the history of French painting during that century, as he bridged the gap between the Barbizon School and the Impressionist School of French painters. He is generally regarded as one of the greatest of the 19th century French painters, and also as an artist of international distinction. His paintings have been very much sought after and collected by art museums and individual art collectors for at least 100 years.

Corot was a prolific painter, his total production having amounted to approximately 2,500 paintings. Some 95 percent of his paintings were landscapes, and he is known mainly as a painter of landscapes. In his middle and later years, however, he painted some figure paintings. The figure paintings, which numbered only about 125 out of Corot's total production of approximately 2,500 paintings, were not painted primarily for sale, but for Corot's own satisfaction, interest, and experimentation, as he used them to work out various pictorial problems.

Corot's beautiful and feathery landscapes were extremely popular in the 19th century, while his figure paintings were virtually unknown during that period. In more recent times, however, due to shifting tastes, Corot's landscapes have taken second place to his figure paintings, which have come to be regarded as perhaps the best part of his work. Because of this, and because of their rarity, Corot's figure paintings have become much more valuable than his landscapes during the present century.

"La Meditation," the painting that is involved in the present litigation, was painted by Corot sometime during the 1840–45 period. It is an oil painting on canvas. In size, it measures 18½ inches high by 13⅜ inches

---

1. In 1969, a year that is not involved in the present litigation, Mrs. Furstenberg contributed the remaining 2/24ths interest in the painting to The University of Houston.

2. Mrs. Furstenberg and Mr. Sheridan were divorced in 1971. Thereafter, she remained a feme sole, again using the name Cecil Blaffer Hudson, until October 17, 1975, when she married Tassilo von Furstenberg, an Austrian citizen.

wide. The painting depicts a young woman (three-fourths length) in an outdoor setting. The subject's head is tilted, and her chin is resting on the index finger of her right hand. Her right elbow and left arm are resting on her lap, over a very full skirt.

The fair market value of "La Meditation" can be readily determined as of June 14, 1963. On that date, the painting was sold at an auction that was conducted by the well-known firm of Sotheby & Company in London. This was an important auction, at which major works of art were offered for sale, which was widely publicized in advance, and which attracted many knowledgeable buyers. "La Meditation" was purchased on that occasion for 18,500 pounds (the then equivalent of $51,800) by the representative of a Liechtenstein corporation known as Schmid & Schmid, for which Mrs. Furstenberg had contributed most of the capital and of which she was a co-owner, along with an international art dealer named Frank Lloyd. Mrs. Furstenberg had been interested in art for a considerable period of time; and she was a collector of, and an investor in, art objects.

The fair market value of $51,800 assignable to "La Meditation" as of June 14, 1963, cannot be accepted, however, as representing the fair market value of the painting some 4½ and 5½ years later, when Mrs. Furstenberg (who had acquired the full ownership of the painting in the meantime) made the contributions of interests in the painting to The University of Houston in December 1967 and in December 1968. The art market was exceedingly "bullish" in the 1960's, and it experienced the sharpest rise between 1963 and 1967. The value of Corot figure paintings was affected by, and part of, this upward trend in the art market.

Despite the "bullish" nature of the art market at the time, efforts to sell "La Meditation" for $95,000 in April 1967 and for $85,500 in the summer and early fall of 1967 were unsuccessful.

It is reasonable to infer that the failure of the sales efforts mentioned in the preceding paragraph was due, at least in part, to what is frequently referred to in the record as "the Helfer restoration."

As of 1966, "La Meditation" had sustained some damage during its comparatively long life of more than 100 years. There was an obvious scratch on the left side of the painting, and another scratch in the lower right-hand corner. There were also some minor abrasions on the shoulder, the neck, the face, and the hands of the figure, so that tiny nubs of canvas were showing where the artist's paint had been abraded.

Despite the damage, however, the physical condition of "La Meditation" was good for a Corot painting more than 100 years old. The scratches and abrasions were not of major significance, as the painting was susceptible of being restored through a careful and expert job of inpainting (*i. e.,* replacing the artist's paint that had been lost).

Sometime during the latter part of 1966, a New York City art restorer named Renee Helfer was commissioned to restore "La Meditation"; and the restoration was performed in November or December of 1966. From the artistic standpoint, the Helfer restoration was almost a disaster. Instead of merely inpainting the scratches and abrasions previously mentioned, the restorer did a considerable amount of overpainting on top of Corot's original paint. There was overpainting in the forehead, the eyebrows, the eyes, both cheeks, the nose, and the mouth of the figure, in an apparent attempt to prettify the subject of the painting. As a result, the character of the painting was considerably changed, to its detriment, and the underlying beauty of the painting was obscured.

It is possible for overpainting to be removed through a process of cleaning. Such a process, however, involves a degree of risk. The condition of the artist's original paint under the overpaint cannot be determined accurately without first removing the overpaint, although experts can form opinions on the subject through the use of various technical aids, such as x-ray photographs, ultraviolet light, and infrared light. The amount of overpaint on "La Medita-

tion" after the Helfer restoration indicated that, potentially, a considerable amount of Corot's original paint might be missing or damaged. Although estimates by experts on the end result of removing the Helfer overpaint by means of a cleaning operation were that the condition of Corot's original paint was good and that cleaning would not damage the painting, an element of risk was still present that a buyer would have to take into account before purchasing the painting as of the dates in issue here. The fact that Corot's subtle technique is particularly vulnerable to overcleaning added to the risk. This risk had a depressing effect on the fair market value of "La Meditation" as of the dates that are involved in the litigation. This was more than offset, however, by the development mentioned in the next succeeding paragraph of this opinion.

Some 2 months before Mrs. Furstenberg made her first contribution of an undivided interest in "La Meditation" to The University of Houston on December 28, 1967, there occurred in the art world an event which was generally regarded as a price "breakthrough" for figure paintings by Corot. On October 26, 1967, at an auction conducted by Sotheby-Parke-Bernet, a Corot figure painting known as "Girl in Red With Mandolin" was sold to Norton Simon, a well-known art collector, for $310,000. This sale—under circumstances which established $310,000 as the fair market value of "Girl in Red With Mandolin" at the time— had the general effect of increasing the fair market value of figure paintings by Corot, including "La Meditation." The fair market value of "La Meditation," however, certainly did not rise to the $310,000 figure that was paid for "Girl in Red With Mandolin" by Norton Simon.

"Girl in Red With Mandolin" is a figure painting of about the same size as "La Meditation," and its physical condition at the time of October 1967 sale was similar to that of "La Meditation" prior to the Helfer restoration. From the standpoint of artistic quality, however, "Girl in Red With Mandolin" is substantially superior to "La Meditation," as the former is one of Corot's finest works whereas "La Meditation" (as originally painted by Corot, and without regard to the detrimental effect of the Helfer restoration) is near the average in artistic quality among the entire group of Corot's figure paintings. This difference is illustrated by the comparative exhibition experience of the two paintings.

Prior to its October 1967 sale, "Girl in Red With Mandolin" was widely known as a famous painting, as it had been featured in a number of significant art exhibitions. It was the only Corot painting chosen for the 1940 Arts Club exhibition in Chicago, which was a great event held to create an interest in modern art in Chicago; it was exhibited as a notable example of Corot's work in connection with the opening of the Museum of Modern Art in New York City; it was exhibited at an important art exhibition in Philadelphia in 1946; it was exhibited at the Chicago Art Institute in 1960; and it was exhibited at the Louvre in 1962. By contrast, the only notable exhibition of "La Meditation" prior to the dates involved in this litigation was at the Chicago Art Institute during a period when the painting was owned by a member of the governing board of that institution.

Five expert witnesses—all with impressive qualifications for the valuation of paintings—testified at the trial and gave expert testimony concerning the fair market value of "La Meditation" as of December 28, 1967, and December 13, 1968, the dates when Mrs. Furstenberg contributed interests in the painting to The University of Houston. Brief summaries of their qualifications and opinions are set out in the findings of fact. Three of these witnesses testified for the plaintiffs and two for the defendant.

Although all the valuation experts had impressive qualifications, the opinions expressed by three of them—Spencer A. Samuels for the plaintiffs, and Eguene Victor Thaw and Alexandre P. Rosenberg for the defendant—are regarded by the trier of the facts as entitled to special weight. Each of these men is an art dealer of long experi-

ence and thus has long been involved in the purchase and sale of valuable paintings; each is the head of an important company operating in this field; and each has had extensive experience in the appraisal of paintings. Unfortunately for the trier of facts, Messrs. Samuels, Thaw, and Rosenberg differed widely with respect to the fair market value of "La Meditation" on the two dates involved in the present litigation, although all agreed that the value did not change between December 28, 1967, and December 13, 1968. Mr. Samuels expressed the opinion that the painting had a fair market value of $250,000 on both of the dates in question; Mr. Thaw assigned a value of $40,000 to the painting on both dates; and Mr. Rosenberg assigned a value of $90,000 to the painting on both dates. [The remainder of the section on valuation is substituted by the court.]

The record indicates that Mr. Samuels and Mrs. Furstenberg are close friends and long-time business associates. Despite his considerable experience, therefore, Mr. Samuels' valuation must be substantially discounted because of his relationship with Mrs. Furstenberg.

As noted, Messrs. Thaw and Rosenberg have had comparable experience as appraisers and as art dealers. They have dealt with approximately the same number of works by Corot, and almost an identical number of Corot figure paintings. The two experts agreed that the 1963 sale of "La Meditation" set the fair market value of the painting at that time, and that the subsequent Helfer restoration had a depressing effect upon the value of the painting. Mr. Rosenberg stated that, but for the Helfer restoration, the upward trend in the art market would have increased the value of "La Meditation" to something more than $100,000 by 1967–68. Mr. Thaw agreed with this general analysis. Both witnesses also stated that the Norton Simon sale had no effect on the value of "La Meditation" because the Norton Simon Corot was a vastly superior work.

The disparity of the ultimate conclusions of Messrs. Thaw and Rosenberg apparently results from differing assessments of the effect of the Helfer overpainting. Mr. Thaw characterized the overpainting as a "mutilation." This seems to us an overreaction. Other experts, specialists in the condition and restoration of paintings, testified that, although some risk of permanent damage existed, a prospective buyer could have ascertained that a skillful cleaning effort probably would have been successful. The $90,000 valuation by Mr. Rosenberg therefore seems closer to the mark than the $40,000 figure, but the opinion of so highly qualified an expert as Mr. Thaw, in so specialized an area as Corot figure paintings, must carry considerable weight. A careful weighing of the testimony of these two witnesses indicates that a preliminary valuation of $75,000 is appropriate.

Messrs. Thaw and Rosenberg both believed that the Norton Simon sale had no impact upon the value of "La Meditation." Although the Norton Simon Corot was superior to "La Meditation" in quality and condition, the two paintings were sufficiently comparable so that the record price Mr. Simon paid necessarily resulted in substantial appreciation in the value of Mrs. Furstenberg's less distinguished painting. Considering all the relevant market factors, including the quality and condition of "La Meditation," the general upward price trend in the art market, and the impact of the Norton Simon sale, the fair market value of "La Meditation" in 1967 and 1968 was $125,000.

### The Joint Venture

The defendant asserts that even if the IRS undervalued "La Meditation" in assessing the income tax deficiencies that are involved in the present case, any recovery by the plaintiffs must be limited because of a joint venture agreement to which Mrs. Furstenberg was a party at the time when she contributed interests in the painting to The University of Houston.

On January 3, 1967, as the result of a series of transactions described in the findings of fact, Mrs. Furstenberg personally became the owner of a group of 132 paint-

ings, "La Meditation" being one of the 132 paintings. Later in the month of January, a Texas corporation known as Beekman Gallery, Inc. (referred to hereafter in the opinion as "Beekman"), was formed, with Mrs. Furstenberg as its sole shareholder. In connection with the formation of Beekman, Mrs. Furstenberg contributed to Beekman the full interest in and title to the 132 paintings just mentioned, including "La Meditation," and she received 100 percent of Beekman's stock.

On February 20, 1967, Beekman, represented by Mrs. Furstenberg, and a Liechtenstein corporation known as Objets d'Art International Establissement (referred to hereafter in the opinion as "OAI"), represented by Spencer A. Samuels (previously mentioned in this opinion as an expert witness for the plaintiffs on valuation), entered into a joint venture "for the purpose of buying and selling paintings and other art objects." The joint venture agreement (in which Beekman was referred to as "Gallery") provided in part as follows:

2. *Contributions.* Both parties to this joint venture shall contribute management and sales services to which no dollar amount shall be assigned. In addition, Gallery shall contribute initially the dollar amount of $1,000,000 represented by and being both the cost to it and the value of all its interest in the paintings and other art objects listed in Schedule A (attached hereto and made a part hereof). It is intended but not required that Gallery shall maintain a contribution to this joint venture of at least $1,000,000 in cost or in value.

3. *Profits.* O.A.I. guarantees to Gallery an annual return of one and one-half per cent (1½%) on the dollar amount of its contributions to this joint venture. Gallery shall receive annually fifty per cent (50%) of the gross profits of the joint venture, but the above-mentioned one and one-half per cent (1½%) is included in any fifty per cent (50%). O.A.I. will bear all of the expenses of the operation of the joint venture and will receive the balance of the profits from the joint venture remaining after Gallery has received its 50%. * * *

4. *Management.* O.A.I. will be the principal manager of the joint venture; provided, however, that * * * no painting * * * shall be sold for less than its value as set forth on Schedule A attached hereto * * * without the written consent of both Parties. * * *

Schedule A, which was attached to and made a part of the joint venture agreement, was a list of the 132 paintings which Mrs. Furstenberg had personally acquired on January 3, 1967, and shortly thereafter had transferred to Beekman, her wholly-owned corporation. "La Meditation" was listed on Schedule A.

In December 1967, Beekman withdrew "La Meditation" from the joint venture, and, wholly in reduction of its surplus, then distributed the painting to Mrs. Furstenberg, the sole owner of Beekman.

Spencer A. Samuels, the American representative of OAI, did not object on behalf of OAI to Beekman's action in withdrawing "La Meditation" from the joint venture. At the time of such withdrawal, the other paintings which Beekman had contributed to the joint venture, and which were subject to the joint venture agreement, had a total fair market value in excess of the $1,000,000 figure prescribed in paragraph 2 of the joint venture agreement, previously quoted.

It was after receiving "La Meditation" from Beekman in December 1967 that Mrs. Furstenberg made the contributions of interests in the painting to The University of Houston on December 28, 1967, and December 13, 1968.

Relying on paragraph 3 of the joint venture agreement, the defendant correctly states that if "La Meditation" had been sold by the joint venture, OAI would have been entitled to part of any profit derived from the sale. The defendant then attempts to make a giant leap forward, from the standpoint of logic, by arguing that the profit-sharing provision of the joint venture agreement somehow affected Mrs. Furstenberg's right to utilize the full fair market

value of "La Meditation" in claiming deductions for her contributions of interests in the painting to The University of Houston. This attempt, while imaginative, falls short of success.

Paragraph 2 of the joint venture agreement did not require, either expressly or by necessary implication, that all of the 132 paintings listed on the attached Schedule A should be permanently committed by Beekman to the joint venture for future sale. That Beekman was vested with flexibility in this respect is indicated by the concluding sentence of paragraph 2, i. e., "It is intended *but not required* that Gallery [Beekman] shall *maintain* a contribution to this joint venture of at least $1,000,000 in cost or in value" (emphasis supplied). In any event, after Beekman withdrew "La Meditation" from the joint venture and distributed it to Mrs. Furstenberg, Beekman continued to "maintain" a contribution to the joint venture in the form of paintings that exceeded in value the $1,000,000 figure mentioned in paragraph 2 of the joint venture agreement.

The parties to the joint venture agreement both construed it as permitting Beekman to withdraw paintings from the joint venture (at least when the remainder of the paintings committed to the joint venture by Beekman had a value of at least $1,000,000). As previously stated, Spencer A. Samuels OAI's American representative, did not interpose any sort of objection when Beekman withdrew "La Meditation" from the joint venture and distributed it to Mrs. Furstenberg. It should also be mentioned in this connection that Mr. Samuels did not object when Beekman subsequently withdrew other paintings from the joint venture and distributed them to Mrs. Furstenberg. Mr. Samuels obviously regarded Beekman as being in compliance with the contribution provision of the joint venture agreement despite such withdrawals, at least so long as the remainder of the paintings committed by Beekman to the joint venture had a fair market value in excess of $1,000,000.

■ Accordingly, Beekman's action in withdrawing "La Meditation" from the joint venture and distributing it to Mrs. Furstenberg did not violate the joint venture agreement; such actions removed "La Meditation" from the scope of the joint venture agreement; and thereafter the joint venture agreement did not in any way inhibit or affect Mrs. Furstenberg's right to make contributions of interests in the painting to The University of Houston.

It should be mentioned, in connection with the point now under discussion, that during the course of negotiations which began in about March 1968 between Mrs. Furstenberg (representing Beekman) and Spencer A. Samuels (representing OAI) over a possible revision of the joint venture agreement, Mr. Samuels took the position that Beekman should compensate OAI for the potential profit which OAI lost because of the withdrawal of "La Meditation" from the joint venture. This appears, however, to have been essentially a strategic move by Mr. Samuels in response to an initial proposal by Mrs. Furstenberg that paragraph 3 of the joint venture agreement, dealing with the subject of profits, should be amended so that Beekman would be guaranteed, on the dollar amount of it contribution to the joint venture, an annual return of more than the 1½ percent provided for in the original version of paragraph 3.

The dispute over the matter of amending the joint venture agreement was ultimately settled on the basis of an agreement that no compensation would be made by Beekman to OAI because of the withdrawal of "La Meditation" from the joint venture agreement, and no compensation, other than that provided for in the original version of paragraph 3 of the joint venture agreement, would be made by OAI to Beekman.

To summarize this part of the opinion, the plaintiffs' right to recovery, as determined in the proceeding part of the opinion, is not affected by the February 20, 1967, joint venture agreement between Beekman and OAI.

## FINDINGS OF FACT

\*   \*   \*   \*   \*   \*

*Expert Testimony on Valuation*

47. (a) Christopher John Burge testified as an expert witness for the plaintiffs on valuation. At the time of the trial, he was in charge of the 19th and 20th century picture department in the American branch of Christie's, a firm of fine-art auctioneers which was founded in London about 200 years ago and has been engaged since then in selling works of art of all kinds. Mr. Burge was formerly the chief cataloger in the Impressionists department of Christie's in London.

(b) Mr. Burge expressed the opinion that the painting had a fair market value of $250,000 in December of 1967 and December of 1968.

(c) Mr. Burge's opinion was based largely on the price of $310,000 for which "Girl in Red With Mandolin" was sold at auction to Norton Simon in October 1967 (see finding 35). Mr. Burge believed that all Corot figure paintings greatly appreciated in value as a result of this high price. He relied to some extent on information which he had received concerning large insurance valuations placed on other Corot figure paintings in recent years.

48. (a) Perry T. Rathbone testified as an expert witness for the plaintiffs on valuation. At the time of the trial, he was Director of the American branch of Christie's. Before joining Christie's, he was Director of the Boston Museum of Fine Arts for 17 years; and, before that, he was for 15 years Director of the City Art Museum in St. Louis (now known as the St. Louis Art Museum).

(b) Mr. Rathbone graduated from Harvard College in 1933, and then spent a year in the graduate study of fine arts at Harvard.

(c) Mr. Rathbone expressed the opinion that the fair market value of the painting in December of 1967 and in December 1968 was from $250,000 to $260,000. His opinion was based principally on what he regarded as the comparability of "La Meditation" and "Girl in Red with Mandolin," and on the $310,000 price that was paid for the latter painting in October 1967.

49. (a) Spencer A. Samuels testified as an expert witness for the plaintiffs on valuation. He is an art dealer, and has been one all of his adult life. He began his career with French & Company, a family business that was founded by his father in 1907. It was his responsibility in the business to develop a department of paintings. He later became Treasurer of the company, and then he served as President of French & Company for the last 5 years of his association with the company. Near the end of his connection with French & Company, he started a gallery of contemporary art. After his father's death, Mr. Samuels left French & Company; and in 1963 he opened his own private art gallery, which was later incorporated as Spencer Samuels & Company, Inc. Mr. Samuels has had extensive experience as an appraiser of valuable oil paintings.

(b) Mr. Samuels expressed the opinion that the painting had a fair market value of $250,000 in December 1967 and in December 1968. His opinion was based principally on the appreciation in value of all Corot figure paintings as a result of the October 1967 sale of "Girl in Red With Mandolin" for $310,000, on what he regarded as the comparability of "La Meditation" and "Girl in Red With Mandolin," and on information which he had received concerning large insurance valuations placed on Corot figure paintings in recent years.

(c) Mr. Samuels and Mrs. Furstenberg are good friends; and they have been business associates for a number of years.

50. (a) Dr. Richard H. Rush testified for the plaintiffs as an expert on valuation. Dr. Rush is an economic and business analyst, with particular emphasis on the art and antique markets. He received a B.A. degree from Dartmouth College, a Master of Commercial Science degree from the Harvard Graduate School of Business Administration, and a Doctor of Commercial Science degree from the Harvard Graduate School of Business Administration. He is the author of three books, one entitled "Art

as an Investment." Although he is not in the business of appraising paintings, he has done some appraisal work from time to time.

(b) Dr. Rush expressed the opinion that the painting had a fair market value in December 1967 somewhere in the range of from $240,000 to $250,000, and that it had a fair market value in December of 1968 of from $250,000 to $265,000. His opinion was based principally on the very significant upward trend in the art market between 1960 and 1967–68, on information which he had received concerning the prices paid for—and quoted by would-be sellers on—other Corot figure paintings in recent years, and on information which he had received concerning large insurance valuations placed on other Corot figure paintings in recent years.

51. (a) Eugene Victor Thaw testified as an expert witness for the defendant on valuation. He is an art dealer; and for more than 27 years has had his own company, which is called E. V. Thaw & Company. He was one of the founding members of the Art Dealers Association of America, has served as Vice-President and later as President of the association, and is still a member of the association's Board of Directors. He has done a great deal of appraisal work in the art field, and, in the course of his career, has done appraisals for and furnished market advice to most of the leading art museums and foundations in the United States. Since 1960, he has sold 20 paintings and two drawings by Corot; and, at the time of the trial, he had six Corots in his business stock and three Corots in his private art collection. Six of the Corot paintings that he has dealt with were figure paintings.

(b) Mr. Thaw expressed the opinion that the painting had a fair market value of $40,000 in December of 1967 and in December of 1968. His comparatively low valuation was based principally upon what he referred to as the "mutilation" of the painting during the course of the Helfer restoration. His opinion was not influenced by the price of $310,000 that was paid for "Girl in Red With Mandolin" in October 1967, as he regarded that painting as being vastly superior in artistic quality to "La Meditation."

(c) Mr. Thaw was a member of the art advisory panel which valued the painting for the IRS as a preliminary to the issuance of the deficiency notices mentioned in finding 11.

52. (a) Alexandre P. Rosenberg testified for the defendant as an expert witness on valuation. He is an art dealer, has been with the firm of Paul Rosenberg & Company for 31 years, and since 1959 has been the sole managing partner of the firm. Mr. Rosenberg is a member of the Art Dealers Association of America. He was the first President of the association, serving in that capacity from 1962 until 1964; and, some years later, he was serving a second term as President of the association at the time of the trial in this case. Mr. Rosenberg has had business dealings with virtually all of the leading art museums and private collectors in this country. He has bought and sold approximately 29 paintings by Corot, eight of which were figure paintings. He has had a great deal of experience as an appraiser of paintings.

(b) Mr. Rosenberg expressed the opinion that the painting had a fair market value of $90,000 in December of 1967 and in December 1968. Mr. Rosenberg regarded the sale of "La Meditation" in June 1963 as determining its fair market value as of that time; and he believed that the substantial upward trend in the art market would have increased the value of "La Meditation" to somewhat more than $100,000 but for the detrimental effect of the Helfer restoration. He discounted the $310,000 price that was paid for "Girl in Red With Mandolin" in October 1967 because he regarded that painting as greatly superior to "La Meditation" in artistic quality.

\*　　\*　　\*　　\*　　\*　　\*

## CONCLUSION OF LAW

On the basis of the trial judge's findings and opinion which, as modified, the court adopts, the court concludes as a matter of

law that the plaintiffs are entitled to recover, but not to the extent requested. Judgment is entered for the plaintiff, and the case is remanded to the Trial Division for a determination of the amount of recovery in accordance with Rule 131(c).