Bert **CROSSWHITE** and Virginia Crosswhite, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

Civ. No. 74–723.

United States District Court, D. Oregon.

Aug. 3, 1977.

Joyle C. Dahl, Duffy, Georgeson, Dahl & Kekel, Portland, Or., for plaintiffs.

Sidney I. Lezak, U. S. Atty., Craig J. Casey, Asst. U. S. Atty., Portland, Or., Robert G. Burt, Trial Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

SKOPIL, Chief Judge:

On September 1, 1970, the plaintiff taxpayers, Bert and Virginia Crosswhite, sold a 68.24-acre parcel of real property to their wholly-owned corporation for $550,000. On their federal income tax return for taxable year 1970, they reported the income from the installment payment received in 1970 as capital gain. The Internal Revenue Service (IRS) assessed a deficiency, finding that the property had been held by the Crosswhites primarily for sale to customers in the ordinary course of their trade or business and that the gain on the sale was therefore taxable as ordinary income.[1] Additionally, the IRS determined that the fair market value of the property on the date of sale was only $331,000, so that $219,000 of the $550,000 purchase price constituted a dividend from the corporation taxable as ordinary income.

---

1. Section 1221 of the Internal Revenue Code (IRC) defines "capital asset" for purposes of determining capital gain or loss as follows:

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) . . . property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

The Crosswhites paid the deficiency assessed and filed a claim for refund. They then brought this action to recover $2,069.00 in deficiency tax, $322.26 in assessed interest, and additional interest as provided by law. The case presents two questions: (1) Was the property held by the Crosswhites primarily for sale to customers in the ordinary course of their trade or business? (2) What was the fair market value of the property on the date of sale?

## FACTS

The real property in question is a rectangular-shaped parcel in southeast Portland bounded by S.E. Foster Road on the north and S.E. Flavel Street on the south and lying to the east of S.E. 112th Avenue. In 1970 the property was zoned R–10 [2] and undeveloped, although sewers were available.

One of the prominent natural features of the property is Johnson Creek, which meanders across the northern portion of the parcel from east to west, not far from S.E. Foster Road. The property fronting on S.E. Foster Road—the site of an old gravel quarry—was suitable for rezoning for commercial, industrial, or multiple-family use. Between 2½ and 4½ acres to the south of Johnson Creek lie within its annual floodway.[3] Further south, the land rises gradually and then more steeply toward the slopes of Mount Scott. The southernmost portion of the parcel consists of good residential view property, with steeper timbered hillsides and two steep sloping drainage bottoms to the north and west.

The property was acquired by the Crosswhites in two stages. The first purchase, in April, 1966, was of the southern 63.56 acres (Tax Lots 1 and 2, Section 22, T1S, R2E), referred to as the Hieman property

or the old Portnomah Dairy. This land was bought from an estate at the very favorable price of $90,463.66. The remaining 4.68 acres fronting on S.E. Foster Road (Tax Lot 225, Section 15, T1S, R2E), known as the Parker-Fuhrman property, was purchased in March, 1969, for $40,000. At the time of the 1970 sale the Crosswhites' adjusted cost basis in the property was $124,851.[4]

The Crosswhites did not solicit buyers for their property between 1966 and 1970, although they were approached by two to four potential purchasers. One of these was Kaiser Foundation Hospitals (Kaiser), which took a three-month option in September, 1969, to purchase the entire property at $7,500 per acre (making a total price of $511,800). The option was not exercised because soil tests revealed that the soil would not support the five-story hospital that Kaiser contemplated building.

On September 1, 1970, however, the plaintiffs contracted to sell the property to Crosswhite Excavating, Inc., their wholly-owned corporation, for $550,000 ($8,060 per acre).[5] Mr. Crosswhite testified that the price was determined by taking the Kaiser option price and adding approximately 10 percent appreciation for the intervening year. The contract provided for payment of $5,000 to the corporation on September 1, 1970, with the deferred balance to be paid in twenty equal annual installments of $43,732.44 each, including interest computed at the rate of five percent per annum.

On their 1970 federal income tax return the Crosswhites treated the sale of the property as the sale of a capital asset, reporting the $425,149 difference between the selling price and the adjusted cost basis as long-term capital gain. Having elected to report the transaction as an installment

---

2. Single-family residential, minimum 10,000 square feet.

3. The 100-year flood plain (below 217 feet elevation) covers approximately 8½ acres.

4. The sum of the purchase prices, plus $4,386.89 spent for a survey and topographical map, minus $10,000 paid by an adjoining property owner for an easement to reach the sewer.

5. On November 30, 1971, a new corporation, Crosswhite Enterprises, Inc., became the successor by merger and change of name to Crosswhite Excavating, Inc. and another wholly-owned corporation, Crosswhite Sand & Gravel, Inc.

sale, the Crosswhites paid income tax at capital gain rates on the $5,000 received in 1970.[6] A deficiency tax was assessed following an audit. Of two transactions challenged by the IRS, the Crosswhites chose to litigate only the one involved in this case.

## CHARACTER OF THE PROPERTY

■ One of the most litigated issues under the Internal Revenue Code is whether particular property constitutes a "capital asset" or "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". 3B Mertens, *Federal Income Taxation* § 22.15, at 113–114 (1973 rev.) [*Mertens*]. The question is particularly difficult to resolve because it is one of fact, dependent on the totality of the circumstances. Prior decided cases are therefore of little precedential value. *Los Angeles Extension Company v. United States*, 315 F.2d 1, 2–3 (9th Cir. 1963).

■ Several factors are relevant (although none is conclusive) in determining whether particular property is held "for sale to customers in the ordinary course of the trade or business". These factors include the following:

1. The frequency, number, and continuity of sales;
2. The substantiality of the income derived from the sales;
3. The nature and extent of the taxpayer's business;
4. The taxpayer's purpose in acquiring the property;
5. The taxpayer's purpose in holding the property;
6. The length of time the property has been held; and
7. The seller's activities with respect to the property, including

   a. Subdivision, platting, and other improvements tending to make the property more marketable, and

   b. Sales activities such as advertising or listing the property for sale directly or through brokers.

*Id.* at 3; Annot., 46 A.L.R.2d 615, 657–658 (1956); *Mertens* § 22.138, at 983–1002. In addition, gain is taxable as ordinary income only if the property in question is held "primarily" for such sale. The Supreme Court has interpreted "primarily" to mean "of first importance" or "principally", noting that

> "[t]he purpose of [IRC § 1221(1)] is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand . . . and 'the realization of appreciation in value accrued over a substantial period of time' on the other." *Malat v. Riddell,* 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966) (per curiam).

The taxpayer, of course, bears the burden of proving the character of the property. *Rockwell v. Commissioner,* 512 F.2d 882, 887 (9th Cir.), cert. denied, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975).

■ When the taxpayer is a dealer in real property, determining whether a specific piece of property constitutes a capital asset is even more difficult. Although he may hold most real property primarily for sale to customers in the ordinary course of business, other real property may be held for investment. Each sale must be analyzed separately to determine the character of that particular property. *Margolis v. Commissioner,* 337 F.2d 1001, 1003–1004, modified in part on rehearing, 339 F.2d 537 (9th Cir. 1964). A real estate dealer is not held to a higher burden of proof than other sellers: he need only establish by a preponderance of the evidence that he held the property for investment. *Mertens* § 22.15, at 124.

■ In this case no one questions that the Crosswhites were dealers in real property. Indeed, the United States Court of Claims has previously determined that they were dealers with respect to certain trans-

---

**6.** The sums involved in this case are relatively small. The outcome will be more significant, however, with respect to the larger payments due during the twenty succeeding taxable years.

actions occurring during 1961 to 1963 and that gain from those sales was subject to tax as ordinary income. *Crosswhite v. United States,* 369 F.2d 989, 177 Ct.Cl. 671 (1966). The Crosswhites acquired nineteen parcels of property and sold seventeen between 1961 and 1971.[7] They stated in their 1970 federal income tax return that their principal business activity was real estate development.[8] The only question is whether the Crosswhites held this particular property as dealers or as investors.

In order to decide this question, an understanding of the nature of the Crosswhites' business is essential. From 1961 to 1971 Mr. and Mrs. Crosswhite were the sole stockholders of an excavating company (Crosswhite Excavating, Inc.), a sand and gravel company (Crosswhite Sand & Gravel, Inc.), and a redi-mix concrete company (Bert's Redi-Mix, Inc.). During this period the Crosswhites bought and sold twelve parcels of real estate for purposes of subdivision development. The parcels ranged in size from 3.038 to 28.0 acres and were generally held for only a few months. In each case the Crosswhites surveyed and platted the tract and utilized their corporations to construct roads, curbs, and water lines and do whatever excavation and gravel work was required to prepare the lots for development. Substantial expenditures were made on these improvements. The parcel was then sold at a very profitable price to one of several builders who were personal acquaintances of Mr. Crosswhite. The decision of the Court of Claims was based on the first five subdivision developments falling within this typical pattern.

The remaining seven purchases and five sales did not fall within the pattern. The first of these transactions involved two developed lots that were taken in payment of a bill in 1963 and resold shortly after. The second involved 15 acres purchased in 1964 as a gravel site. A portion of this parcel

was sold in 1974 and the rest retained. The third purchase was of nine acres of farm land bought in 1964 along with the 28-acre tract of developable land at the seller's request. The farm land was resold seven years later in its undeveloped state. At the time of trial, the Crosswhites still owned two acres acquired in 1966 with other assets of A & A Clay Products, a failing business, as well as an undeveloped 5.85-acre tract of river property purchased in 1971. Another 6.5-acre tract purchased in 1971 was sold at cost the next year to the Crosswhites' son for him to develop. The only other transactions were the purchases and sales of the 4.68-acre and 53.56-acre tracts involved in this case. The facts with respect to the acquisition, holding, and sale of this land are described in detail in the following paragraphs. All property was carried on the books as inventory by the Crosswhites' accountant.

Mr. Crosswhite, who was familiar with the old Portnomah Dairy property, became interested in buying it when he first saw a for sale sign posted. He inquired about the price and decided it was too high. Several months later, however, he saw an advertisement by a real estate firm saying the price was reduced. The sellers were then asking $3,500 an acre, and Mr. Crosswhite offered $1,000. Although the sellers refused this offer, they did agree to sell for a flat price of $90,000. Mr. Crosswhite testified that he bought the land simply because the price was good but that he did not have any particular plans for it.[9] Part of the land was already rented for pasture at $100 per month. Mr. Crosswhite did not know the exact acreage contained in the property when he brought it. In order to establish the property corners and avoid potential adverse possession claims, he obtained a survey shortly after the land was purchased. He did not engage in any other activities with respect to the property ex-

---

7. The transactions are summarized in Plaintiffs' Exhibits 8A and 8B.

8. Plaintiffs' Exhibit 1, Schedule C, line A.

9. An IRS Revenue Agent, Ronald Ostrem, testified to inconsistent statements allegedly made by Mr. Crosswhite during a 1971 interview as to his motives in acquiring the property. I do not find Mr. Ostrem's testimony persuasive in considering the evidence as a whole.

cept to make general inquiries about the status of plans to correct Johnson Creek flood problems. He made no overtures to sell the property, plat it, or obtain a zone change.

The Crosswhites owned the Portnomah Dairy property for three years before they purchased the Parker-Fuhrman property fronting on S.E. Foster Road. Mr. Crosswhite testified that he bought this property because he could apply toward the $40,000 purchase price the $10,000 an adjoining property owner had offered to pay for an easement across this land and the Portnomah Dairy property to the existing sewer. Once again, he had no plans for the property when he bought it. Because of Johnson Creek, it did not serve as access to the property previously acquired. Mr. Crosswhite's only activities with respect to the Parker-Fuhrman property were general inquiries to the planning commission about the possibilities for rezoning from residential use.

Five months after buying the Parker-Fuhrman property, the Crosswhites contracted to sell the entire 68.24 acres to Crosswhite Excavating, Inc. Mr. Crosswhite testified that there were two reasons for selling: to avoid exposure to personal liability in the event efforts might be made to change the channel of Johnson Creek and to facilitate whatever development might occur by making the corporation's assets available. No specific development plans had then been formulated.[10] Subsequent to the sale, however, the corporation has developed a planned unit development called Portnomah Park in the southeast corner of the property and has sold 2.29 acres fronting on S.E. Foster Road to Franz Bakery. The remainder of the land remains undeveloped.

In analyzing the Crosswhites' normal business transactions and their purchase and sale of the property involved in this case, I am persuaded by a preponderance of the evidence that these 68.24 acres were held primarily for investment rather than for sale in the ordinary course of business. The property was not handled in a manner even remotely resembling the pattern of the Crosswhites' subdivision developments. The Portnomah Dairy property, making up the great majority of the 68.24 acres, was purchased at a bargain price and held for three and a half years before resale. This parcel was much larger than any previously developed and had very different topographical features. The Crosswhites had no plans to develop either this parcel or the Parker-Fuhrman property at the time of purchase. They made no improvements or efforts to sell. They were not sure what their corporation would do with the property at the time they sold it. Indeed, most of the land remains undeveloped some seven years later. All of these facts lead me to conclude that the property was not held for sale to customers in the ordinary course of business, let alone held *primarily* for such purpose. Although the precedential value of other cases is limited, I find substantial support for my conclusion in *Turner v. Commissioner*, 540 F.2d 1249 (4th Cir. 1976), *Municipal Bond Corporation v. Commissioner*, 382 F.2d 184 (8th Cir. 1967), and *Scheuber v. Commissioner*, 371 F.2d 996 (7th Cir. 1967), all of which involved taxpayers who were real estate dealers but were found to have acquired certain property for investment.[11]

Since the property sold by the Crosswhites in 1970 constituted a capital asset, the income received by them from the sale was subject to tax at capital gain rates. If the sale price exceeded the fair market value of the property, however, the excess constituted a dividend from the Crosswhites' corporation taxable as ordinary income. It is therefore necessary to determine the fair market value of the property as of September 1, 1970, the date of sale.

---

10. Mr. Crosswhite's testimony with respect to the purpose of the sale appears at pages 28–29 of his deposition and pages 60–62 and 76–77 of the trial transcript.

11. The cases cited by the defendant involving sales to controlled corporations are distinguishable on their facts.

## FAIR MARKET VALUE

The Crosswhites produced two witnesses in support of their contention that the property had a fair market value of $550,000 when sold to the corporation. The first was Mr. Crosswhite himself, who testified that he set the price at what he believed to be the fair market value in light of the earlier option to Kaiser.[12] The second was James H. Nelson, a retired real estate broker with experience in appraising real estate. Mr. Nelson had conducted an appraisal of the property for the Crosswhites in 1974 in which he had concluded that its fair market value as of September, 1970, was $570,000.[13] At the time of trial he made certain adjustments to his earlier report to arrive at a value of $516,192 ($7,564 per acre). Mr. Nelson utilized a method of appraisal referred to as the land residual technique.[14]

Three expert witnesses testified for the defendant. The testimony of one, Robert C. Shipley, Jr., was chiefly in rebuttal to Mr. Nelson's conclusions. Mr. Shipley arrived at a value of $313,844 using the land residual technique but stated that he believed the market data approach [15] to be the best valuation method. Using the latter approach, he concluded that the property had a per-acre value of $5,000 (total value of $341,200). Both of the other witnesses—Donald W. Lantz and Harold E. Meyer—used the market data approach exclusively. Mr. Lantz, a civil engineer with appraisal experience employed as an Engineer Revenue Agent by the IRS, selected ten comparable sales.[16] Based on the varying physical characteristics of different portions of the subject property, he assigned differing values to each using the sales deemed most comparable to that portion. He arrived at a fair market value of $351,000 ($5,144 per acre). Mr. Meyer, a professional real estate appraiser and consultant with extensive experience, relied upon eight comparable sales.[17] His approach was basically similar to Mr. Lantz's except that he used two alternative methods of dividing the property into separate portions for purposes of assigning respective values. Mr. Meyer estimated a value of $399,256 ($5,851 per acre).

The testimony of every expert witness was higher than the $331,000 value argued by the defendant and lower than the $550,000 value argued by the plaintiffs. To summarize, the experts assigned the following values:

|  | Total Value | Average Per-Acre Value |
| --- | --- | --- |
| Nelson | $516,192 | $7,564 |
| Meyer | $399,256 | $5,851 |
| Lantz | $351,000 | $5,144 |
| Shipley | $341,200 | $5,000 |

I do not find the testimony of any witness to be completely persuasive. Mr. Crosswhite, as the owner of the property, is of course entitled to give his opinion of its value. I have no reason to believe that the 1970 sale price was determined by him in

12. The Crosswhites disclaim any intention to rely upon the option itself as evidence of value.

13. Appraisal Report of June 20, 1974 (Def.Ex. 13).

14. Under this technique, the appraiser goes through a two-step process. First, he estimates the gross revenue that could be derived from the property over a period of time when developed to its best use. Second, he deducts from that figure the estimated development costs, including construction costs, administrative expenses, sale costs, and developer's profits. The net figure remaining, discounted to present value, is the estimated value of the raw land. See Paul Fullerton, "Appraisal of Vacant Land–Development Analysis", in *Encyclopedia of Real Estate Appraising* 709–723 (Friedman rev.ed.1968) [*Friedman*].

15. Under this approach, the appraiser analyzes other sales of property to find those which are most comparable to the subject property in terms of date of sale, location, and physical characteristics. The prices for which the comparable properties sold are then adjusted upwards or downwards to account for dissimilarities with the subject property. Using these market data, the appraiser formulates an opinion of the relative value of the property being appraised.

16. The comparables are shown in Defendant's Exhibits 6 and 7.

17. The comparables are shown in Defendant's Exhibits 1 and 5.

anything but good faith. Nevertheless, more objective evidence establishes that the fair market value on September 1, 1970, was something less than $550,000. Even the Crosswhites' own expert testified to a value more than $30,000 below the sale price.

The land residual technique used by Mr. Nelson leaves much to be desired. Small variations in the appraiser's assumptions can produce substantially different conclusions, as evidenced by the revision in Mr. Nelson's own opinion from $570,000 down to $516,192. Some of the assumptions on which Mr. Nelson relied are subject to doubt. Moreover, the market data approach is generally preferred where comparable sales can be found. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 69 (6th ed.1973); *Friedman* 15.

Although I do not adopt completely the conclusions of Mr. Meyer and Mr. Lantz, their approach to the question of fair market value is basically sound. The comparable sales to which they testified provide an adequate foundation for assigning per-acre values to the property in question.

Tax Lot 225, consisting of 4.68 acres fronting on S.E. Foster Road, is clearly of a different character from the rest of the property. Both Mr. Meyer and Mr. Lantz analyzed this parcel separately. Mr. Meyer assigned a value of $10,000 per acre; Mr. Lantz apparently assigned a value of $8,583.[18]

Two sales used by the witnesses are good comparables: one of a 3.80-acre parcel sold on May 27, 1970, for $30,000 ($7,895 per acre) [19] and the other of a 20.39-acre parcel sold on August 6, 1969, for $175,000 ($8,583 per acre).[20] The parties failed to mention another sale that is also significant: the Crosswhites' purchase of the parcel in question in March, 1969, for $40,000 ($8,547 per acre). Making appropriate adjustments for the dissimilarities between these sales and the sale by the Crosswhites, I find that a value of $9,000 per acre should be assigned to Tax Lot 225, for a total value of $42,120.

Valuation of the remainder of the property is somewhat more difficult because of the topography of the 63.56 acres contained in Tax Lots 1 and 2. Mr. Meyer assigned a value to this parcel using two alternative methods: assigning an average per-acre value of $5,500 for the parcel as a whole, and assigning differing values to various portions of the parcel ($2,500 to the flood plain, $3,000 to the steep land, and $6,500 to the rest). Mr. Lantz assigned a value of $5,753 per acre to the southernmost view property, half that value to the steep land and $5,000 to the rest.

Of course, none of the comparables used by the witnesses shares all of the physical characteristics of the subject property. Taken together, however, they are adequate to permit a reasonable conclusion as to the value of Tax Lots 1 and 2. One of the best comparables is a 4.78-acre parcel to the south of S.E. Flavel Street, which sold for $27,500 ($5,753 per acre) on July 17, 1970.[21] Another comparable relied on by Mr. Meyer, but not Mr. Lantz, is also highly relevant: a 4.75-acre parcel sold on November 10, 1970, for $33,500 ($7,053 per acre).[22] Although the Crosswhites' property presents some unique developmental problems because of Johnson Creek and the steeper areas, many of these apparent

---

18. It is not clear from Mr. Lantz's testimony whether this value was assigned to all of Tax Lot 225 or only the better portions, with a value of $6,400 to $6,500 assigned to the remainder.

19. Mr. Meyer's sale "H" and Mr. Lantz's sale "3".

20. Mr. Meyer's sale "G" and Mr. Lantz's sale "4".

21. Mr. Meyer's sale "D" and Mr. Lantz's sale "7".

22. Mr. Meyer's sale "A".

shortcomings are of such a nature that they need not be a detriment to successful development.[23] I find that a per-acre value of $6,400 should be assigned to Tax Lots 1 and 2, for a total value of $406,784.

## CONCLUSION

■ In light of the conclusions outlined above, I find that the Crosswhite property constituted a capital asset having a fair market value of $448,904 when it was sold on September 1, 1970. The sale price therefore exceeded its fair market value by $101,096. This excess constitutes a dividend to the Crosswhites taxable as ordinary income. The IRS properly determined that the portion of the Crosswhites' gain attributable to this excess which was subject to taxation in 1970 was taxable as ordinary income. The plaintiffs are, however, entitled to a refund of deficiency tax and assessed interest for 1970 insofar as the remainder of their gain was improperly taxed as ordinary income rather than capital gain. The parties are directed to submit within 15 days a proposed form of judgment in accordance with this opinion.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

23. Much of the steep area has in fact been utilized as common area in Portnomah Park, the planned unit development which was approved after the 1970 sale. See Defendant's Exhibits 2 and 3.