GRAHAM D. WILLIFORD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williford v. Commissioner
Docket No. 26613-89
United States Tax Court
T.C. Memo 1992-450; 1992 Tax Ct. Memo LEXIS 470; 64 T.C.M. (CCH) 422; August 10, 1992, Filed Decision will be entered under Rule 155. For Petitioner: Arthur R. Snyder. For Respondent: Martin M. Van Brauman and Mark B. Barta. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: The primary issues in this case are whether petitioner held certain paintings for sale to customers, the fair market value of a frieze contributed by petitioner, and related additions to tax. Respondent determined the following deficiencies and additions to tax: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651
[1]6653(a) [1]6653(a)(2) [2] 6659 6661
1984
$ 259,097
$ 67,647
$ 18,678
[3]
$ 28,580
$ 40,957
1985
9,515
2,700
1,105
[3]
2,855
0
1986
348,377
--  17,419
[3]
11,471
77,535
By notice of deficiency, respondent also determined that petitioner was liable for increased interest under *471 section 6621(c). The issues for decision are: 1. Whether paintings petitioner sold in 1984 and 1986 were held for sale to customers. We hold that they were not. 2. Whether the fair market value of a frieze contributed by petitioner was $ 500,000 in 1984. Respondent contends that it was $ 150,000. We hold that it was $ 375,000. 3. Whether petitioner is liable for an addition to tax for late filing under section 6651(a)(1) [1] for 1984 and 1985. We hold that he is. 4. Whether petitioner is liable for additions to tax for negligence for 1984 and 1985 under section 6653(a)(1) and (2) and for 1986 under section 6653(a)(1)(A) and (B). We hold that petitioner is liable as to sections 6653(a)(1) and 6653(a)(1)(A) with respect to the Schedule C deductions relating to his sale of investment paintings. As to sections 6653(a)(2) and 6653(a)(1)(B), *472 we hold that he is not liable with respect to his characterization of the paintings as capital assets and his valuation of the Garrett frieze. 5. Whether petitioner is liable for additions to tax for valuation overstatement and substantial understatement of taxes under sections 6659 or 6661 for 1984, 1985, and 1986. We hold that he is not liable under section 6659. A Rule 155 computation is necessary to determine whether he is liable under section 6661. 6. Whether petitioner is liable for the interest on substantial underpayments attributable to tax-motivated transactions under section 6621(c) for 1984, 1985, and 1986. We hold that he is not. 7. Whether petitioner is liable for self-employment taxes for 1984 and 1986. We hold that he is not. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
Petitioner resided in Fairfield, Texas, when he filed his petition. Petitioner engaged in farming activities from 1960 to 1968. Petitioner has collected the works of 19th Century American Impressionist artists since 1957. His collection includes works by artists from the Hudson River School dating from 1820 to 1905. He owns works by *473 Thomas Cole, Asher Brown Durand, Sanford R. Gifford, Worthington Whittredge, Elihu Vedder, Charles Caryl Coleman, and Thomas Wilmer Dewing. Petitioner's personal collection includes several hundred paintings. Petitioner filed Federal income tax returns for 1984 on December 12, 1985, and for 1985 on August 19, 1986. Petitioner did not obtain extensions of time to file these returns. Petitioner's 1986 return was timely filed. 2. Petitioner's Art Activities
From 1980 through the years at issue, petitioner was a part-time art dealer, with no other interests except in family land investments. Petitioner spent about 10 percent of his time in 1984 through 1986 as an art dealer. Petitioner does not maintain a gallery open to the public. Petitioner bought and sold for resale paintings with a value of $ 5,000 to $ 25,000. Petitioner sold art at auction or on consignment to other art dealers. Edward Shein (Shein) and Richard T. York (York) were the art dealers primarily used by petitioner. Petitioner did not conduct his art activities under any trade name. Petitioner also bought paintings as an investment. Petitioner acquired "Two Boys and a Dog After a Fox" by William H. *474 Beard by exchanging other paintings for it in 1962. He bought "Japanese Screen" by Robert Reid in 1964, "The Reader" by John White Alexander in 1964, "Two Heads" by Elihu Vedder in 1968, and "The Song" by Thomas Wilmer Dewing in 1970. In 1980 petitioner traded a painting he bought in 1973 for "Drifting On the Lagoon" by Ralph Curtis. In 1982 he traded two paintings (one acquired in the mid-1960s and one in 1970) for "Quince Blossom" by Charles Caryl Coleman. Petitioner acquired these paintings for his personal collection and kept them in his apartment. Over the years petitioner lent paintings to museums for public exhibitions, including several of the paintings he sold in 1984 and 1986. a. 1984
Petitioner lived in an apartment at 102 East 10th Street in New York City during part of 1984. He had a couple of hundred paintings in his private collection in his apartment. He also conducted his part-time art dealership from that apartment. He stored his dealer inventory mainly at Cirker Hayes, a storage warehouse in New York City, and also had some at his apartment. Petitioner acquired the same kind of art for resale as the art that he collected. In 1984, petitioner advertised *475 "Two Boys and a Dog After a Fox" for sale. In 1984 petitioner sold Shein the following paintings: (1) "Two Boys and a Dog After a Fox" for $ 100,000, (2) "The Japanese Screen" for $ 150,000, and (3) "The Song" for $ 400,000. Petitioner had not offered to sell paintings to Shein before Shein's 1984 purchases. Petitioner delivered a pastel by Walter Gay to the Richard York Gallery to sell in 1984. A buyer unknown to petitioner bought the painting for $ 5,625. Petitioner used some of the proceeds from these sales to purchase an apartment at 250 West 82d Street in New York City. b. 1985-1986
Petitioner lived at and conducted his part-time art business from his 250 West 82d Street apartment in 1985 and 1986. Petitioner also kept his personal collection there in 1985 and 1986. In 1986 petitioner sold Shein the following paintings: (1) "Two Heads" for $ 500,000, (2) "The Reader" (also called "The Woman in Black") for $ 250,000, and (3) "Quince Blossom" for $ 250,000. Petitioner delivered "Drifting On the Lagoon" to York to sell for him. York sold it for $ 128,000 in 1986. Over a 10-year period, York bought, sold, or took on consignment approximately *476 12 to 15 paintings for petitioner. Petitioner did not maintain complete records identifying the paintings sold, selling prices, dates of sales, original costs, or dates of purchases and exchanges. Petitioner kept "Two Boys and a Dog After a Fox" in storage because it was too big for his apartment. He kept "The Reader", which he sold in 1986, either in the warehouse or in the apartment. c. Petitioner's Tax Return Treatment of Sales of Art -- 1984 to 1986
Petitioner listed his occupation as "art dealer" on his 1984 and 1985 returns and listed his business activity as "art sales" on Schedule C filed with his 1984, 1985, and 1986 returns. Petitioner listed Principal Business Code 5884 ("other retail stores") on Schedule C filed with his 1985 and 1986 returns. Petitioner reported no income from his Schedule C art activity for 1984. He treated all of the paintings sold (totaling $ 663,115) and the donated frieze (discussed below) as dispositions of capital assets. Petitioner reported $ 52,830 in Schedule C expenses for 1984, which includes advertising of "Two Boys and a Dog After a Fox" ($ 1,202), the use of the apartment ($ 15,615), storage ($ 8,767), art restoration ($ 12,672), *477 and other miscellaneous expenses. Petitioner did not advertise his inventory. For 1985, petitioner reported that his Schedule C art activity had gross receipts of $ 31,784, cost of goods sold of $ 24,255, and expenses of $ 36,630, for a net loss of $ 28,716. For 1986, petitioner reported that his Schedule C art activity had gross receipts of $ 1,040, cost of goods sold of $ 1,300, and expenses of $ 31,594, for a net loss of $ 31,854. Petitioner had sales of paintings of $ 1,128,000 which he treated as the disposition of capital assets. Petitioner deducted storage warehouse expenses for Cirker Hayes as a Schedule C expense for 1984 through 1986. 3. The Garrett Frieze
Petitioner purchased the "Garrett frieze" by Thomas Wilmer Dewing (Dewing) in 1969 for $ 1,800, and donated it to the Brooklyn Museum of Art on December 20, 1984. The Brooklyn Museum of Art is a section 501(c)(3) organization qualifying as a charitable organization under section 170(a)(1) and (c) in 1984. The Garrett frieze was commissioned by architect Stanford White and installed in the Baltimore, Maryland, home of Mr. and Mrs. Robert Garrett (now the Engineers Club in Baltimore). Dewing painted from *478 about 1875 to 1910. Dewing completed the Garrett frieze in 1885. It is 110.50 feet long. It consists of five panels with the following dimensions: Two panels
29 ft. x 39 in.
One panel
30 ft. 6 in. x 39 in.
Two panels
11 ft. x 39 in.
The Garrett frieze is a decorative frieze, consisting of repetitive patterns. When donated in 1984, it was in good condition for a 100-year old painting. It was repairable through a careful and expert job of restoration. Petitioner reported $ 10,000 as his basis in the Garrett frieze on the 1984 return. Petitioner attached to his 1984 return a copy of a receipt from the Brooklyn Museum, which included the date of the donation, a description of the Garrett frieze, and a photographic reproduction of several of the panels of the Garrett frieze. Petitioner also attached an appraisal by York. York appraised the frieze at $ 500,000 as of December 20, 1984. York was an expert in 19th century American art and artists. Petitioner chose York because of petitioner's previous relationship with him. Petitioner did not pay York for his appraisal. Petitioner deducted the maximum allowable amount as a charitable contribution of a capital asset on *479 his 1984 tax return ($ 191,285). He carried over the excess, deducting $ 36,240 in 1985 and $ 76,475 in 1986. The Brooklyn Museum estimated the in-house restoration cost of the Garrett frieze to be $ 44,000. The Museum will restore all or part of the frieze for inclusion in a traveling exhibition. OPINION 1. Were Paintings Sold by Petitioner Held for Sale in Ordinary Course of Business
Petitioner argues that the paintings he sold in 1984 and 1986 were from his personal collection and were not held primarily for sale in the ordinary course of business. Section 1221(1) excludes from capital asset classification -- stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * * The function of section 1221(1) is "to differentiate between the 'profits and losses arising from the everyday operation of a business' * * * and 'the realization of appreciation in value accrued over a substantial period of time'". Malat v. Riddell, 383 U.S. 569, 572 (1966). *480 "Primarily" means "principally" or "of first importance." Malat v. Riddell, supra.
Whether property is held by a taxpayer "primarily for sale to customers in the ordinary course of * * * business" is a question of fact. S & H, Inc. v. Commissioner, 78 T.C. 234, 242 (1982). Courts consider numerous factors in deciding this issue, and no one factor is controlling. Biedenharn Realty Co. v. United States, 526 F.2d 409, 415 (5th Cir. 1976). Petitioner bears the burden of proving that his property was not so held. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The following factors indicate whether property is held primarily for sale to customers in the ordinary course of a trade or business: (1) The frequency and regularity of sales; (2) the substantiality of sales; (3) the length of time the property was held; (4) the nature and extent of petitioner's business and the extent to which petitioner segregated the paintings from business inventory; (5) the purpose for which petitioner acquired and held the property before sale; (6) the extent of petitioner's sales efforts by advertising *481 or otherwise; (7) the time and effort petitioner devoted to the sales; and (8) how the sales proceeds were used. Byram v. United States, 705 F.2d 1418, 1424 (5th Cir. 1983); United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); Ross v. Commissioner, 227 F.2d 265 (5th Cir. 1955), revg. T.C. Memo. 1954-177; Goldberg v. Commissioner; 223 F.2d 709 (5th Cir. 1955), revg. 22 T.C. 533 (1954); Guardian Industries v. Commissioner, 97 T.C. 308, 316-317 (1991). We will apply these factors to the facts in this case. a. Number and Regularity of Sales
Petitioner did not sell paintings regularly in the years at issue. He sold a total of eight paintings, four in 1984 and four in 1986. The frequency and substantiality of sales is the most important factor. Suburban Realty Co. v. United States, 615 F.2d 171, 176 (5th Cir. 1980); Biedenharn Realty Co. v. United States, 526 F.2d 409, 416 (5th Cir. 1976); Buono v. Commissioner, 74 T.C. 187, 199 (1980). We believe the infrequency of petitioner's *482 sales shows that he held the paintings for investment rather than for sale. Suburban Realty Co. v. United States, 615 F.2d 171, 174 (5th Cir. 1980) (244 sales over 32-year period); Biedenharn Realty Co. v. United States, 526 F.2d 409, 411-412 (5th Cir. 1976) (during 31-year period, taxpayer sold 208 lots and 12 individual parcels from subdivision in question; 477 lots were sold from other properties); United States v. Winthrop, supra at 907 (456 sales over 19-year period). b. Substantiality of Sales
Petitioner sold four paintings in 1984 for a profit of $ 645,875, and four paintings in 1986 for a profit of $ 1,112,000. These sales were substantial in that petitioner made a profit of $ 1,757,875. Courts generally view frequent sales that generate substantial income as tending to show that property was held for sale rather than for investment. Suburban Realty Co. v. United States, supra at 181; Biedenharn Realty Co. v. United States, supra. However, where substantial profits result from capital appreciation and not the taxpayer's efforts, as they do here, infrequent *483 sales that generate large profits tend to show that property was held for investment. See Bramblett v. Commissioner, 960 F.2d 526 (5th Cir. 1992), revg. T.C. Memo. 1990-296. c. Duration of Ownership
Petitioner held three of the paintings he sold in 1984 ("Two Boys and a Dog After a Fox" acquired in 1962, "Japanese Screen" acquired in 1964, and "The Song" acquired in 1970) and for an average of about 19 years, and the four paintings he sold in 1986 ("The Reader" acquired in 1964, "Two Heads" acquired 1968, "Drifting On the Lagoon" acquired in 1980, and "Quince Blossom" acquired in 1982) for an average of about 13 years. This factor favors petitioner. d. Segregation of Paintings From Petitioner's Art Business
Property held for sale and property held for investment must be separately identified. Scheuber v. Commissioner, 371 F.2d 996, 998-999 (7th Cir. 1967), revg. T.C. Memo. 1966-107; Frank H. Taylor & Son, Inc. v. Commissioner, T.C. Memo. 1973-82. See, e.g., Goodman v. United States, 182 Ct. Cl. 662, 390 F.2d 915, 919 (1968); Crosswhite v. United States, 438 F. Supp. 368, 373 (D. Or. 1977). *484 Respondent argues that petitioner did not distinguish between his personal collection and the dealer inventory which were kept in his New York apartment. We disagree. Petitioner generally kept his personal art collection and dealer inventory separate. He kept his collection in his apartment, except "Two Boys and a Dog After a Fox" which was too big for the apartment. He stored his inventory mainly at Cirker Hayes. e. Purpose of Acquisition
Petitioner did not purchase the paintings he sold in 1984 and 1986 with the intent to resell them, nor were they ever held primarily for sale to customers. Petitioner purchased the paintings for his private collection. This factor favors petitioner. f. Sales and Advertising Effort
With the exception of "Two Boys and a Dog After a Fox", petitioner did not advertise the paintings for sale. Petitioner accepted an unsolicited offer from Shein to purchase the paintings in 1986. Petitioner did not enhance the value of the paintings during the holding period. This factor favors petitioner. g. Time Petitioner Devoted to Sales Activity
Petitioner derived income from personal investments and managing family properties. Petitioner *485 did not devote much time or effort to the sale of his investment paintings. For example, he sold paintings to Shein in 1986 at Shein's request. He also used York as an agent to sell paintings in 1984 and 1986. In Byram v. United States, supra, the Fifth Circuit affirmed the District Court's finding that the taxpayer did not hold property for sale despite 22 sales over a 3-year period for a profit of $ 3.4 million. The Court stated: Though these amounts are substantial by anyone's yardstick, the district court did not clearly err in determining that 22 such sales in three years were not sufficiently frequent or continuous to compel an inference of intent to hold the property for sale rather than investment. This is particularly true in a case where the other relevant factors weigh so heavily in favor of the taxpayer. "Substantial and frequent sales activity, standing alone, has never been held to be automatically sufficient to trigger ordinary income treatment." * * * [Byram v. United States, supra at 1425. Citations omitted.] In Byram, the taxpayer did not initiate the sales, advertise, have a sales office, develop the *486 property, or spend a great deal of time on the transactions. Id. at 1424. The taxpayer held the property for 6 to 9 months. See also Ross v. Commissioner, 227 F.2d 265 (5th Cir. 1955) (taxpayer, who was actively engaged in practice of law, made one to two sales of lots a month for 2-year period in liquidation of capital asset; he made no improvements to property, and did not list property with real estate dealers, advertise, or make efforts to sell); Goldberg v. Commissioner, 223 F.2d 709 (5th Cir. 1955) (sales of rental housing units to occupants due to poor returns from rental business resulted in capital gain; taxpayers' sales deemed to be disposition or liquidation of rental business). This factor favors petitioner. h. How the Sales Proceeds Were Used
Another factor is whether the sales proceeds were used to replace the property sold. Use of sales proceeds to replenish inventory indicates property is held for sale. Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 51.2.3, at 51-18, par. 51.2.4, at 51-23 (2d ed. 1990). In contrast, taxpayers who sell off property they do not intend to *487 replace are often accorded capital gain treatment for liquidating a capital asset. Ross v. Commissioner, supra at 268; Goldberg v. Commissioner, supra at 713. Here petitioner used some of the sales proceeds to buy a new apartment in New York City. There is no indication that he used any of the proceeds to buy paintings. All of these factors favor classification of these paintings as not being held for sale to customers. Respondent points out that petitioner stated that he was an art dealer on his income tax returns and at trial. Citing White v. Commissioner, 172 F.2d 629 (5th Cir. 1949), [2] affg. a Memorandum Opinion of this Court dated Sept. 25, 1947, respondent argues that this constitutes petitioner holding himself out as an art dealer. Respondent also argues that petitioner's activities were those of an art dealer, and he held the paintings primarily for sale to customers in the ordinary course of business.
*488 We do not agree with respondent in light of the overwhelming facts in support of petitioner's investment purpose. Petitioner held numerous paintings in inventory for sale to customers and also held paintings for investment. The fact that petitioner was a part-time art dealer does not mean he could not also hold paintings as an investment. It is well established that a taxpayer may hold one kind of property for sale to customers and the same kind of property as an investment. Eline Realty Co. v. Commissioner, 35 T.C. 1 (1960); Mieg v. Commissioner, 32 T.C. 1314 (1959); Crabtree v. Commissioner, 20 T.C. 841 (1953). We conclude that the factors weigh heavily in favor of petitioner's holding the paintings for investment. He did not initiate sales or advertise the paintings (with one exception), he devoted minimal time and effort to the sale of the paintings, and he held the property on the average between 13 and 19 years. We hold that petitioner did not hold the paintings for sale to customers. 2. Value of the Garrett Frieze
Respondent concedes that petitioner donated the Garrett frieze to a qualified charitable *489 donee under section 170(c). The issue we must decide is the fair market value of the Garrett frieze donated by petitioner. a. Fair Market Value
In general, the amount of a charitable contribution of property other than money is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c) (1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 550-551 (1973); sec. 1.170A-1(c) (2), Income Tax Regs.
Fair market value is a question of fact to be determined from an examination of the entire record. Lio v. Commissioner, 85 T.C. 56, 66 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987). Fair market value is a question of judgment rather than mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347. Valuation is an approximation derived from all the evidence. *490 Helvering v. Safe Deposit & Trust Co., 316 U.S. 56, 66-67 (1942). Petitioner bears the burden of proving that respondent's determination of the fair market value of the frieze is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). b. Expert Testimony
The parties each called expert witnesses to give their opinions about the value of the Garrett frieze. Expert witnesses' opinions can aid the Court in understanding an area requiring specialized training, knowledge, or judgment. However, as the trier of fact, the Court is not bound by the experts' opinions. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938). The opinions of expert witnesses are weighed according to their qualifications and other relevant evidence. Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part, remanding in part T.C. Memo. 1956-178; Johnson v. Commissioner, 85 T.C. 469, 477 (1985). Petitioner's witnesses, Richard York and Dr. Susan Hobbs (Hobbs), and respondent's witness, Dr. Charles Peavy (Peavy), all have well-established expertise in *491 the field of the arts relevant to the object at issue here. On his tax return and throughout this case, petitioner has claimed that the fair market value of the Garrett frieze was $ 500,000 on December 20, 1984. The IRS determined that the fair market value of the Garrett frieze was $ 1,300 on December 20, 1984. Respondent now argues that the fair market value was $ 150,000. c. Petitioner's Experts
i. York
York has appraised and sold 19th century and early 20th century American art for approximately 19 years. He has done appraisals for many prominent museums around the country. As the owner of a gallery, York has bought and sold thousands of paintings. York was appointed by the Commissioner to the Art Advisory Panel on April 19, 1991. The Art Advisory Panel is a voluntary group of distinguished art experts who advise the IRS about the value of particular works of art. Furstenberg v. United States, 219 Ct. Cl. 473, 595 F.2d 603, 605 (1979). Respondent argues that York's appraisal of the Garrett frieze did not conform to the appraisal format under Rev. Proc. 66-49, 1966-2 C.B. 1257, 1258, or any appraisal *492 format of the Internal Revenue Service in 1984, in that it failed to include a detailed description of the frieze, proof of the frieze's authenticity, and a summary of York's qualifications. However, we find that York complied substantially with the information requirements of Rev. Proc. 66-49, supra. York's appraisal of the Garrett frieze was based upon information he obtained from the marketplace, and from petitioner and Shein, concerning private sales of works by Dewing. He considered petitioner's 1984 sale of Dewing's "The Song" for $ 400,000. York's February 12, 1991, report also considered private sale information in Hobbs' report of January or February 1991. Respondent contends that the fact that petitioner did not pay York for the appraisal, and that York bought, sold, or took on consignment 12 to 15 paintings for petitioner over a 10-year period, indicates a special business relationship which led York to give an inflated appraisal of the frieze. We found nothing in York's testimony or report to support respondent's allegations. ii. Hobbs
Hobbs, an academician and researcher, has extensive knowledge of Dewing's works. Hobbs began *493 studying the works of Dewing in 1974. She will publish a catalogue raisonne (i.e., a description) of all of Dewing's works. Hobbs has inspected more than 430 of the 500 known works completed by Dewing. She has compiled extensive information about the provenance (chain of ownership) of each Dewing painting and the prices for which many were bought or sold. Hobbs had gathered information on the Garrett frieze as part of her research of Dewing's works before petitioner contacted her in 1989. Hobbs testified that in her opinion the Garrett frieze had a fair market value of $ 500,000 on December 20, 1984, based on her knowledge of sales of Dewing paintings before and after that date. d. Respondent's Expert -- Peavy
Peavy is a tested and certified appraiser, has previously testified as an expert witness in the Tax Court on the valuation of fine art, and is a member of several appraisal societies. Peavy discussed several potential art valuation methods, such as the French point method, [3] the future use method, the appraiser's own judgment, and comparable sales. *494 Peavy used his own judgment to a great extent because he believed there was a lack of verifiable, comparable sales of Dewing paintings. Peavy believed that a decorative frieze with repetitive figures is not comparable to paintings of fine art or easel paintings, even though by the same artist. He rejected using sales of other art by Dewing as any indication of the value of the Garrett frieze. Petitioner criticized Peavy's use of statistics and charts from the American Art Analog, a publication which Peavy admitted at trial was unreliable. Petitioner criticized Peavy's reliance on the auction market as the only source of information about sales of paintings. In particular, Peavy cited the 1985 sale for $ 3,850 of "Young Girl in White" as evidence of the low auction prices Dewing paintings realized at the time of the contribution of the Garrett frieze. Hobbs expressed doubt as to whether the painting was a genuine Dewing. She indicated that its low price may have been the result of doubt on the part of the buyers as to its authenticity. e. Discussion
The parties agree that only auction sales and private sales which are documentable or verifiable should be considered in *495 valuing paintings. Hobbs relied heavily on her considerable knowledge about private sales of Dewing works. Because of the depth of her research and the credibility of her testimony, we believe she has adequately verified and documented these private sales, within the limits of confidentiality required by the buyers and sellers involved. Notwithstanding Peavy's claim that Hobbs' sales information was inaccurate (for example, Hobbs stated that the "Lady in White" sold in 1984 for $ 95,000, but Peavy believes the price was $ 93,000), we find Hobbs' report highly credible. Petitioner asserts that the Garrett frieze is unique, and that there are no other works by Dewing of the same magnitude as the Garrett frieze to compare in ascertaining its fair market value. The most useful starting point in valuing the Garrett frieze in the record before us is the sales prices of other oil on canvas paintings by Dewing. Generally, comparable sales of similar properties that are reasonably proximate in time represent the best evidence of fair market value. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24, 1233 (1987). Sales that occurred during years other than *496 those in issue may be helpful in deciding fair market value because they can either show a trend or indicate the fair market value for the years in issue. Estate of Spruill v. Commissioner, supra at 1233; Estate of Gilford v. Commissioner, 88 T.C. 38, 52-55 (1987). Subsequent events or facts may be used to corroborate an appraisal that is based on facts known as of the valuation date. See Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. T.C. Memo. 1982-440. We also consider sales of comparable property occurring after the valuation date if there are no uncertain probabilities or contingencies which affect the value of the property. Estate of Thompson v. Commissioner, 89 T.C. 619, 628-629 n.7 (1987), revd. on other grounds 864 F.2d 1128 (4th Cir. 1989); Estate of Stanton v. Commissioner, T.C. Memo. 1989-341; Estate of Moss v. Commissioner, T.C. Memo. 1982-85. Considering the limited sales activity of Dewing's works, it is reasonable to examine transactions within 2 or 3 years before and after December *497 20, 1984, the date of contribution. These prices range from $ 110,000 for the "Portrait of a Lady" sold in 1980, to $ 1,000,000 for "The Garland" sold in December 1986, to $ 1,200,000 for the "White Birch" sold in June 1987. We believe Peavy was the least persuasive expert with respect to the Garrett frieze. He emphasized Dewing paintings sold at auction and rejected using private sales of other art by Dewing. His reluctance to rely on private sales appeared primarily to be a result of his lack of familiarity with those sales. However, we believe petitioner's experts overstated the value of the frieze. We believe that there is a limited market for the Garrett frieze due to its large size and uniqueness. Hobbs and Peavy agreed that the market for the Garrett frieze is limited to institutions, such as museums, because of its large size. We also consider that the frieze, although in good condition for a 100-year old painting, needs to be restored before it can be exhibited. While we agree that comparable sales are reliable in determining value, we note that the Garrett frieze is so large as to make comparisons very difficult. Finally, we believe post-contribution comparable *498 sales should be discounted. We do not believe petitioner's experts gave adequate weight to these factors. Considering the entire record, we conclude that the fair market value of the Garrett frieze donated by petitioner in 1984 is $ 375,000. 3. Character of the Frieze
On brief, respondent attempted to raise for the first time the issue of whether petitioner held the Garrett frieze as dealer property or as a capital asset. Respondent argued that petitioner's treatment of the Garrett frieze as a long-term capital asset rather than as ordinary income property was erroneous, and that his charitable contribution deduction is limited to his cost basis because a sale of the frieze would have produced ordinary income. Sec. 170(e)(1)(A). This new issue was not raised in the notice of deficiency, nor pleaded by respondent in the answer to the petition or at trial. Moreover, the evidence presented at trial did not put the Court or petitioners on notice that there is a new issue. It was simply raised without notice or explanation in respondent's opening brief. Petitioner objected in his reply brief. This Court has held frequently that issues raised for the first time on brief *499 will not be considered. Philbrick v. Commissioner, 27 T.C. 346, 353 (1956); Hettler v. Commissioner, 16 T.C. 528, 535 (1951). Accordingly, we sustain petitioners' objection that this new issue was not timely raised and therefore is not properly before this Court. 4. Additions to Tax
a. Section 6651(a)(1)
Respondent determined that petitioner is liable for an addition to tax under section 6651(a)(1) for 1984 and 1985 for untimely filing his returns. Petitioner bears the burden of proving that his failure to file a timely return is due to reasonable cause and not willful neglect. United States v. Boyle, 469 U.S. 241, 245 (1985); Baldwin v. Commissioner, 84 T.C. 859, 870 (1985); Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). Petitioner filed his 1984 and 1985 returns late without obtaining extensions of time to file. Petitioner did not show reasonable cause for his failure to timely file his 1984 and 1985 returns. Therefore, we sustain respondent's determination. b. Section 6653(a)
*500 Respondent also determined that petitioner is liable for the section 6653(a) addition for negligence or intentional disregard of rules or regulations. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299; Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner must show that he acted reasonably and prudently and exercised due care. Neely v. Commissioner, supra.
Section 6653(a)(1) (and section 6653(a)(1)(A)) imposes an addition to tax equal to five percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) (and section 6653(a)(1)(B)) imposes an additional liability of 50 percent of the interest due on the underpayment of tax attributable *501 to negligence or intentional disregard of rules or regulations. Petitioner testified that his reporting of a $ 10,000 cost basis for the frieze, instead of $ 1,800, was due to a mistake by his accountant. Given York's reputation, we conclude that petitioner's reliance on the York appraisal as the basis for his deduction for the Garrett frieze on his 1984 tax return was reasonable. We conclude that petitioner is not negligent as to his claimed valuation of the Garrett frieze. However, we find that petitioner was negligent in deducting advertising, rent on his apartment, and other expenses relating to his investment paintings on the Schedule C's he filed with his 1984 and 1986 returns. c. Section 6659
Section 6659 provides for an addition to tax of up to 30 percent where there is a valuation overstatement and an underpayment in income tax of at least $ 1,000 attributable to the valuation overstatement. Sec. 6659(a) and (b). A valuation overstatement is a claim by a taxpayer on a return of the value or adjusted basis of any property, which is 150 percent or more of its true value or true adjusted basis. Sec. 6659(c). We conclude that the section 6659 addition to tax does *502 not apply to petitioner because 150 percent of the correct value of the Garrett frieze ($ 375,000) would be $ 562,500, and petitioner claimed a value of $ 500,000. d. Section 6661
Section 6661(a) imposes an addition to tax of 25 percent when there is a substantial understatement of income tax. A substantial understatement exists if in any year the amount of the understatement exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the return. Sec. 6661(b)(1)(A). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2)(A); Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989); Woods v. Commissioner, 91 T.C. 88, 94 (1988). In view of our holdings regarding the value of the frieze and the character of the paintings sold by petitioner, it is likely that recomputation of the tax under Rule 155 will reveal an underpayment less than 10 percent of the amount required to be shown. Otherwise, we sustain respondent's determination as petitioner has not demonstrated why section 6661 should *503 not apply. e. Section 6621(c)
Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where there is a "substantial underpayment" (an underpayment that exceeds $ 1,000) in any taxable year "attributable to 1 or more tax-motivated transactions." Section 6621(c)(3) defines certain transactions as tax-motivated transactions. The increased interest is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into before that date and "regardless of the date the return was filed." H. Conf. Rept. 98-861, 1984-3 C.B. (Vol. 2) 1, 239; Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Increased interest under section 6621(c) has been upheld in cases involving "blatant misuse of the charitable donation provisions." Snyder v. Commissioner, 86 T.C. 567, 588-589 (1986); Parker v. Commissioner, 86 T.C. 547, 566-567 (1986); Johnson v. Commissioner, 85 T.C. 469, 483-484 (1985). *504 Section 6621(c)(3)(A)(i) includes a valuation overstatement as a "tax-motivated transaction". A valuation overstatement exists "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis." Sec. 6659(c). We have found that there is no valuation overstatement in this case. Consequently, there is no tax-motivated transaction and no increased interest under section 6621(c). 5. Self-employment Taxes
Section 1401 imposes a tax on net earnings from self-employment income, defined as gross income derived from carrying on a trade or business, less allowable deductions. Sec. 1402(a); sec. 1.1401-1(c), Income Tax Regs.
Respondent contends that petitioner's net earnings of $ 400 or more from self-employment are subject to self-employment tax. Petitioner did not realize net gains from self-employment in any of the years at issue. Accordingly, we hold that petitioner is not liable for the tax on self-employment income. Accordingly, Decision will be entered under Rule 155. Footnotes
1. Section 6653(a)(1)(A) and (a)(1)(B) were in effect for 1986. ↩
2. Respondent concedes that if the addition to tax under section 6659 is applicable, the addition to tax under section 6661 is not. ↩
3. Fifty percent of the interest due on $ 259,097, $ 9,515, and $ 348,377 for 1984, 1985, and 1986, respectively.↩
1. All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In affirming the Tax Court's holding that the taxpayer held property primarily for sale in the ordinary course of business, the Fifth Circuit considered the fact that the taxpayer indicated on his return that he was a real estate dealer.↩
3. The French point or square inch system establishes "value per square inch of a given work by an artist through the recorded sales of other works by the same artist." Neither York, Hobbs, nor Peavy used the French point method in this case.↩